**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | | |
|---|---|---|
| **TIMOTHY EARLE,** | § | |
| | § | |
| **v.** | § | **NO.  A-05-CA-470 LY** |
| | § | |
| **JO ANNE B. BARNHART,** | § | |
| **COMMISSIONER OF THE SOCIAL** | § | |
| **SECURITY ADMINISTRATION** | § | |

**REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

TO:    THE HONORABLE LEE YEAKEL
         UNITED STATES DISTRICT JUDGE

Before the Court are Plaintiff's Brief (Clerk's Doc. No. 11);  Defendant's Brief in Support of the Commissioner's Decision (Clerk's Doc. No. 13); Plaintiff's Reply Brief (Clerk's Doc. No. 14); and the Social Security Record filed in this case  (Cited as "Tr.").  The Magistrate Court submits this Report and Recommendation to the United States District Court pursuant to 28 U.S.C. § 636(b) and Rule 1(h) of Appendix C of the Local Court Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges.

**I.  PROCEDURAL HISTORY**

Plaintiff Timothy Earle ("Plaintiff") applied for Supplemental Security Income Benefits ("SSI") and Disability Insurance Benefits ("DIB") on April 15, 2003, alleging inability to work due to his HIV positive status, depression, and anxiety.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), which was held on August 19, 2004.  The ALJ denied Plaintiff benefits in a decision issued September 21, 2004.  Plaintiff appealed this decision to the Appeals Council and submitted additional evidence for review.  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on April 15, 2005.  On June 22, 2005, Plaintiff brought this action

pursuant to 42 U.S.C. § 405(g) for judicial review of the final decision of the Commissioner of the Social Security Administration ("Commissioner") denying Plaintiff disability benefits.

## II.  ISSUES PRESENTED

Plaintiff contends that the ALJ's decision that Plaintiff was not disabled within the meaning of the Social Security Act is not supported by substantial evidence and is not based upon the proper legal standards.  Specifically, Plaintiff raises the following issues: 1) Plaintiff's HIV positive status meets the requirement of Listing 14.08; 2) the ALJ gave too much weight to the opinions of the non-examining, non-treating doctors; 3) the ALJ improperly discounted his credibility; and 4) the ALJ needed to make a separate finding regarding Plaintiff's ability to maintain employment.

## III.  STATEMENT OF THE CASE

Plaintiff contends that he has been unable to engage in substantial work activity since March 31, 2003 due to his HIV positive status, depression, and anxiety.  Plaintiff was represented at the hearing by an attorney.  A medical expert and vocational expert testified at the hearing.

### A.      Plaintiff's Testimony

Plaintiff testified that he was born on May 10, 1965 and was 39 years old at the time of the hearing.  Tr. 273.  Plaintiff is currently single, although he was previously married.  Tr. 274.  He does not have any children.  *Id.*  Plaintiff testified he lives alone in an apartment.  Tr. 276.  Regarding his educational background, Plaintiff stated that he graduated from high school and completed one semester of college.  Tr. 273.

From 1995 until 1998, Plaintiff worked for Noll's Wholesale.  Tr. 274.  Plaintiff began working there full-time driving a delivery van and then went into sales.  *Id.*  Plaintiff sold whole sale flowers from 1995 until 2001, during which time he also worked for Pikes Peak of Texas and Allied

Wholesale Florist.  *Id.*  Plaintiff also did some part-time janitorial work.  Tr. 274-75.  At the time of

the hearing, Plaintiff had been working 8 to 16 hours a week during July and August of 2004 assisting

a friend put up vinyl siding.  Tr. 273.  Other than that part-time work, Plaintiff has not done any work

since March 31, 2003.  *Id.*  His father is supporting him financially.  *Id.*

He asserted that he is unable to work because he has been diagnosed with AIDS.  Tr. 275.

His symptoms are fatigue, loss of weight, night sweats, and diarrhea.  Tr. 275.  On December 1,

2003, Plaintiff stated that his weight was 193 pounds and at the time of the hearing it was about 155

pounds. Tr. 276.  He asserted that he is 6 feet tall.  *Id.*  Plaintiff has night sweats a couple times a

week.  Tr. 276.  He has diarrhea 4-6 times a months for 2 to 4 days at a time, during which time he

has diarrhea 6 to 10 times a day.  Tr. 275-76.

Plaintiff testified that he does his own cooking, but he has a friend that will occasionally cook

for him if he is feeling poorly.  Tr. 276.  The same is true for his laundry.  *Id.*  Plaintiff asserted that

he does his own grocery shopping most of the time.  *Id.*   A friend of his does the housework because

he states that vacuuming and cleaning in the bathroom make him nauseous and because he does not

have much energy.  Tr. 277.  Plaintiff testified that he had a driver's license but it was taken away

because he did not have any insurance.   *Id.*  He uses public transportation to get to doctor's

appointments.  *Id.*  Plaintiff stated that he sleeps 10 to 11 hours a day and spends most of the day on

the couch, but he tries to attend Alcoholics Anonymous and Narcotics Anonymous daily.  Tr. 277-78.

Plaintiff asserted that 3 or 4 days a week he has no energy and has diarrhea.  Tr. 278.  Although

Plaintiff has a history of illegal drug and alcohol use, he has been sober since January 3, 2003.  *Id.*

Plaintiff's HIV cocktail consists of Combivir and Sustiva, however, he had not started it at

the time of the hearing.  Tr. 279.  He also takes Effexor, Trazodone, and Vistaril.  *Id.*  The Vistaril

is for panic attacks, which he has as often as twice a week and as infrequently as one every two months. *Id.* He stated the panic attacks are brought on by stressful situations or being around a lot of people, but he never knows when they will occur. *Id.* If he has the Vistaril on him, he calms down in 30 minutes to an hour. Tr. 281. However, he claimed that if he does not have his medication with him, it can take hours to calm down. *Id.* The only side effect he experienced from taking the medication is that the Trazodone, which he takes in the evenings, makes him drowsy. *Id.*

## B.    Medical Expert's Testimony

The medical expert ("M.E.") testified that Plaintiff was admitted to a detoxification unit in January of 2003 at which time he was diagnosed with HIV and Hepatitis C. Tr. 281. His T-cell count was 600 and has dropped to 400 or lower recently. *Id.* Plaintiff was incarcerated from June to December of 2003. *Id.* The M.E. testified that Plaintiff weighed 160 pounds when he entered prison, 193 pounds when he was released, and has now dropped back down to 155 to 160 pounds, which the M.E. states is normal because lots of people gain weight when they are incarcerated. Tr. 281-82. Additionally, in June of 2004, Plaintiff had a minor relapse of his alcohol problems. *Id.*

As for his diarrhea, the M.E. stated that Plaintiff has been tested to determine the cause, and the tests have not found anything that is causing the diarrhea. Tr. 282. The M.E. testified that diarrhea can be a symptom of HIV when a person gets a bacterial or parasitic infections or it can be a side effect of the chemical cocktail, which Plaintiff had not started at the time of the hearing. *Id.* However, the M.E. stated that Plaintiff's diarrhea did not appear to be related to his HIV positive status or Crohn's disease. Tr. 283.

The M.E. asserted that Plaintiff's conditions individually or in combination do not meet the listings. *Id.*  The M.E. stated that Plaintiff should be limited to light work, so he should not be lifting more than 20 pounds, because people with HIV, especially once they start the chemical cocktail, complain of fatigue.  *Id.*  The M.E. testified that she has not seen any documented mental limitations. As for the side effect from Trazodone, the M.E. said drowsiness is the intended purpose of the drug. *Id.*  The M.E. stated that Plaintiff had been diagnosed with depressive disorder and adjustment disorder, but the M.E. had not seen any severe limitations that were secondary to the psychiatric.  *Id.* The M.E. testified that the only time she noted Vistaril as being prescribed was May of 2003, however, Plaintiff testified that he has filled the prescription since then.  Tr. 285.

The M.E. testified that despite the fact that the listing for HIV includes chronic diarrhea and the wasting syndrome, the M.E. did not believe Plaintiff met the listing.  *Id.*  Although Plaintiff reported his T-cell count was 30, the M.E. testified that it has never been that low.  *Id.*[1]  The M.E. stated that a count of 200 is low, but with a count of 275, Plaintiff does not meet the listing.  Tr. 286.[2]

## C.    Vocational Expert's Testimony

The V.E. testified that Plaintiff's past relevant work as a driver was semiskilled with medium exertional demands.  *Id.*  His work as a salesperson was light and semiskilled.  *Id.*

---

[1]It appears that Plaintiff is confusing absolute CD 4 results with CD 4 percentage results. (CD 4 lymphocytes are also known as T-cells.)  The blood test taken while Plaintiff was incarcerated, which had a result in the 30s, was a test of his CD 4 *percentage*.  A CD 4 percentage test states the percentage of the total lymphocytes in the sample that are CD 4 lymphocytes.  The result on the particular test referred to by the Plaintiff 35.8, with a range of normal being 30.8 - 58.5.  Tr. 236.

[2]As noted earlier, the Plaintiff testified at his hearing that his T-cell count was 600, but had dropped to 400 or lower recently.  Tr. 281.

The ALJ then posed a hypothetical question to the V.E., which asked the V.E. to consider a hypothetical individual who was 39, had made it through one semester of college after graduating from high school, had done Plaintiff's past relevant work, and could occasionally lift and carry 20 pounds, frequently lift and carry 10 pounds, and stand, walk, and sit for no more than 6 hours.  *Id.*  The ALJ stated that the limits on pushing and pulling are the same as lifting and carrying.  Tr. 286-87.  The ALJ told the V.E. that because of fatigue and side effects of medications, the person is limited to understanding, remembering, and carrying out routine step instructions.  Tr. 287.  The ALJ stated the person would be able to appropriately respond to supervisors and coworkers and do jobs that do not require independent decision-making.  *Id.*  Additionally, the ALJ stated that the person could only perform work where the interpersonal contact was incidental to the work performance.  *Id.*  The V.E. stated that with these limitations, the Plaintiff could not perform his past relevant work.  *Id.*

However, the V.E. testified that Plaintiff could perform unskilled, light assembly jobs, of which there are 25,000 in Texas and 300,000 in America.  *Id.*  Additionally, Plaintiff could do unskilled, light hand packaging jobs, of which there are 12,000 in Texas and 135,000 in the U.S.  *Id.*  Plaintiff could also do hand working jobs of which there are 7,000 in Texas and 80,000 nationally. *Id.*

The V.E. stated that any person who is absent more than 2 days a month, even for a legitimate medical reason could be terminated.  Tr. 288.  The V.E. also testified that in these jobs, going to the bathroom once an hour and sometimes two or three times an hour would not be acceptable.  *Id.*  As for nausea causing an inability to concentrate, the V.E. asserted that would not cause a problem because these jobs do not require much concentration.  *Id.*

6

**B.     Medical Records**

The following is a summary of Plaintiff's medical records which are relevant to the issues presented in the instant case.  The relevant time period is March 31, 2003, the alleged onset of Plaintiff's disability, through the date his insured status expired.  At the time of the hearing, Plaintiff's insured status had not expired.  Plaintiff must demonstrate that he was under a disability on or before the date on which his insured status expires, in order to receive benefits.  *See Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990) ("Claimants bear the burden of establishing a disabling condition before the expiration of their insured status").

At the first relevant doctor's visit on April 3, 2003, Dr. Acker stated that Plaintiff's T-cell count was 625 and Plaintiff reported loose stools for the first time.  Tr. 169.  Given Plaintiff's T-cell count and viral load, treatment for HIV was not recommended at the time.[3]  Tr. 170.  On May 7, 2003, Dr. Acker noted that Plaintiff did not think his diarrhea was associated with any food and pointed out that the parasite and other tests had all come back negative.  Tr. 165.  Dr. Acker noted that Plaintiff did not have an opportunistic infection and did not find Plaintiff to have HIV wasting, but noted he had diarrhea and difficulties in social functioning.  Tr. 191-93.  On July 29, 2003, Plaintiff refused the HIV medication, saying that he did not think he should have to pay for it.  Tr. 235.

On September 22, 2003, Dr. Williams conducted a psychological exam, during which Plaintiff reported that he began to have anxiety attacks accompanied by panic and hyperventilation after he stopped drinking.  Tr. 186.  Dr. Williams found Plaintiff's thought processes and content, perception,

---

[3]According to Dr. Brown, the chemical cocktail is not normally started until the patient's T-cell count is below 350 or if the patient has a viral load greater than 55,000.  Tr. 220.

cognition, and memory to be normal, however, he found his judgment and insight to be below normal because of his drug and legal problems.  Tr. 187-88.  Dr. Williams found Plaintiff had depressive and personality disorder and assessed Plaintiff's GAF to be around 50-55.[4]  Tr. 188-89.  The psychologist found Plaintiff's prognosis to be guarded to poor because of Plaintiff's co-existing medical problems. Tr. 189.  Although Dr. Williams found Plaintiff to be intellectually capable of managing his Social Security benefits, since Plaintiff has judgment problems, Dr. Williams felt that a guardian might be needed.  *Id.*

Dr. Boulos did a psychiatric evaluation of Plaintiff on October 27, 2003.  Tr. 143.  He determined that Plaintiff did not have a severe medical impairment.  *Id.*  He found that Plaintiff had depressive disorder that was characterized by sleep disturbance, thoughts of suicide, and anxiety.  Tr. 146.  Dr. Boulos also stated that Plaintiff had a personality disorder because he had a problem with authority and responsibility and was incarcerated on a second forgery offense.  Tr. 150.  The doctor also found that Plaintiff had a problem with substance addiction.  Tr. 151.  Dr. Boulos determined Plaintiff had mild restrictions in his daily living, maintaining social functioning, and in maintaining concentration, persistence, or pace.  Tr. 153.  The doctor found Plaintiff had had no episodes of

---

[4]GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning."  *See Boyd v. Apfel*, 239 F.3d 698, 699 n.2 (5th Cir. 2001) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 32 (4th ed. 1994)).  A GAF of 41-50 indicates serious symptoms or any serious impairment in social, occupational, or school functioning.  *Ochoa v. Barnhart*, No. Civ. A. SA04CA0888RFN, 2005 WL 2708809, *6 n.84 (W.D. Tex. 2005 Oct. 17, 2005) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 30 (4th ed. 2000)).  A GAF of 55 indicates moderate difficulty in social or occupational functioning, as in few friends or conflicts with peers or coworkers. *Monroe v. Barnhart*, 372 F.Supp. 976, 988 n.14 (S.D. Tex. 2005) (quoting AMERICAN PSYCHIATRIC ASS'N DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS at 30 (4th ed. 2000)).

decompensation.  *Id.*  Plaintiff reported he had been depressed since his mother died in 1988, and he constantly thought about suicide and had a semiautomatic pistol that he could use if he wanted to. *Id.*  Dr. Boulos found Plaintiff's memory to be intact, concentration good, and that he could complete tasks in a timely, accurate manner over a sustained period of time.  *Id.*  However, Plaintiff's judgment and insight were considered below normal because he has been incarcerated twice and abuses drugs and alcohol.  *Id.*  The doctor found that Plaintiff's alleged limitations were not fully supported by the evidence in the record.  *Id.*

On October 28, 2003, Dr. Spoor, a medical consultant, reviewed the medical records and determined that Plaintiff could occasionally lift and carry 20 pounds, could frequently lift and carry 10 pounds, could stand, sit, or walk for 6 hours of the week day.  Tr. 136.  Dr. Spoor found that Plaintiff's ability to push and pull was limited in the same manner as Plaintiff's lifting and carrying is limited.  *Id.*  At the time, Plaintiff's T-cell count was 625 and Dr. Spoor saw no sign of opportunistic infections.  *Id.*  Dr. Spoor did note that Plaintiff complained of weakness, fatigue, and diarrhea.  *Id.* Dr. Spoor found Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations.  Tr. 137-39.  Dr. Spoor determined that Plaintiff's alleged limitations were not fully supported by the medical and other evidence in the record.  Tr. 140.  She stated that Plaintiff's complaints of weakness and fatigue  were taken into account in determining Plaintiff's residual functional capacity.  *Id.*

On December 1, 2003, Plaintiff reported to Dr. Acker that his T-cell count while in prison was 39 and that he refused an HIV cocktail after taking it for a week because of the side effects.  Tr. 159.[5] Plaintiff refused the chemical cocktail and counseling for his depression.  Tr. 160.  On December 15,

---

[5]As noted previously, this was a CD 4 percentage test, not an absolute T-cell result.

2003, Dr. Acker noted that Plaintiff had chronic diarrhea, hepatitis C, reflux, a history of IV drug use, and depression and noted that the IV drug use was in remission. Tr. 158. Plaintiff's T-cell count was 411, and he reported blood in his stools. *Id.*

On January 15, 2004, Plaintiff requested that Dr. Acker fill out disability papers, which Dr. Acker said that he would not do because Dr. Acker believed that Plaintiff was not totally disabled and needed to find a job, at which point Plaintiff became angry. Tr. 210. Dr. Acker reported on July 13, 2004, that Plaintiff had missed a number of appointments with him because Dr. Acker told the district attorney that Plaintiff was able to work, which made Plaintiff angry. Tr. 208. On July 23, 2004, the last visit covered in the medical records, Dr. Acker found that Plaintiff's T-cell count was below 300, so Plaintiff needed to be started on the chemical cocktail. Tr. 207.

## IV. FINDINGS OF ADMINISTRATIVE LAW JUDGE

After review of the medical evidence, consideration of Plaintiff's testimony, the vocational expert's testimony as well as consideration of Plaintiff's alleged disabling impairments, the ALJ determined that Plaintiff was not disabled within the meaning of the Social Security Act. The ALJ determined that Plaintiff had severe impairments of HIV positive status, depression, and anxiety, but that such impairments did not meet the Listing of Impairments. Tr. 17. The ALJ found Plaintiff's allegations of total disability not credible. Tr. 18. The ALJ pointed out that Plaintiff's refusal to take medication for HIV did not demonstrate that his symptoms are so severe as to be disabling. *Id.* Additionally, although Plaintiff claims he has AIDS, the ALJ noted that the record does not support that conclusion. *Id.*

Although the ALJ stated that the M.E. did not find that Plaintiff's mental limitations were supported by the record, the ALJ stated he gave the Plaintiff the benefit of the doubt regarding his

10

complaints of depression and anxiety and found that Plaintiff was moderately limited in his ability to maintain social functioning and concentration. Tr. 18-19. The ALJ found that Plaintiff could lift and carry 20 pounds occasionally and 10 pounds frequently, sit, stand, and walk 6 of the 8 hours in a work day, and push and pull with the weight limitations for lifting and carrying. Tr. 19. The ALJ also found that the Plaintiff could understand, remember, and carry out routine step instructions, respond appropriately to supervisors and coworkers in jobs that do not require independent decision making, and has the mental capacity to perform work where interpersonal contact is only incidental to work performance. *Id.* The ALJ stated that this residual functional capacity determination was consistent with the opinion of Plaintiff's treating physician and the medical evidence. *Id.* The ALJ adopted the conclusion of the V.E. that Plaintiff could not longer perform his past relevant work. *Id.*

The ALJ found that Plaintiff is a younger individual as defined in the regulations. *Id.* In regards to the Medical-Vocational Guidelines, the ALJ noted that Plaintiff had a high school education and had no transferable skills from any past relevant work or transferability of skills was not an issue in the case. *Id.* The ALJ determined that Plaintiff could perform a significant range of light work as defined in the regulations. *Id.* Although the ALJ determined that Plaintiff could not return to his past relevant work, he found that Plaintiff could make a successful adjustment to work that exists in significant numbers in the national economy. Tr. 20. Thus, the ALJ concluded Plaintiff was not disabled under the Social Security Act. *Id.*

## V.  STANDARD OF REVIEW

In Social Security disability appeals, the limited role of the reviewing court is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole

and whether the Commissioner applied the proper legal standard. *Kinash v. Callahan*, 129 F.3d 736, 738 (5th Cir. 1997); *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996); *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995). "Substantial evidence is more than a scintilla, less than a preponderance, and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990) (quoting *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983)). Courts weigh four elements of proof when determining whether there is substantial evidence of a disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) her age, education, and work history. *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995). However, the reviewing court cannot re-weigh the evidence, but may only scrutinize the record to determine whether it contains substantial evidence to support the Commissioner's decision. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). "The Commissioner, rather than the courts, must resolve conflicts in the evidence." *Martinez*, 64 F.3d at 174. If supported by substantial evidence, the Commissioner's findings are conclusive and are to be affirmed. *Crowley v. Apfel*, 197 F.3d 194, 197 (5th Cir. 1999).

## VI.   ANALYSIS

The Social Security Act defines "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. § 404.1520 (1999).

First, the claimant must not be presently working at any substantial gainful activity.[6]  Second, the claimant must have an impairment of combination of impairments that is severe.  An impairment or combination of impairments is "severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. § 404.1520(c).  Third, the claimant's impairment must meet or equal an impairment listed in the appendix to the regulations.  Fourth, the impairment must prevent the claimant from returning to her past relevant work.  Fifth, the impairment must prevent the claimant from doing any relevant work, considering the claimant's residual functional capacity, age, education, and past work experience.  20 C.F.R. § 404.1520.

At steps one through four, the burden of proof rests upon the claimant to show she is disabled.  *Crowley*, 197 F.3d at 198.  If the claimant acquits her responsibility, at step five the burden shifts to the Commissioner to show that there is other gainful employment that claimant is capable of performing in spite of her existing impairments.  *Id.*  If the Commissioner meets this burden, the claimant must then prove she in fact cannot perform the alternate work.  *Id.*

## A.    Did Plaintiff's HIV Positive Status Meet Listing 14.08(I)?

Plaintiff argues that the ALJ erred in not finding that Plaintiff had an impairment that met the requirements of § 14.08(I) of the listings, because Plaintiff asserts that the evidence in the record shows chronic diarrhea causing involuntary weight loss.  In response, Defendant argues that, although Plaintiff lost almost 40 pounds, that weight loss was a result of Plaintiff putting on weight in prison due to inactivity and then returning to his normal weight once he was released.  Defendant asserts that Plaintiff did not lose a significant portion of his baseline weight.  Defendant also points out that

---

[6] Substantial gainful activity is work activity that is both substantial and gainful.  Substantial work activity is work activity that involves doing significant physical or mental activities.  Gainful work activity is work activity that an individual performs for pay or profit. 20 C.F.R. 416.972.

although Plaintiff contends there is new and material evidence supporting his argument, Plaintiff has

not pointed to any new and material evidence.[7]  In his reply, Plaintiff argues that the reason he gained

weight in prison was because he was not on the HIV medications while he was incarcerated.

       The Commissioner uses a sequential five-step test to determine whether a claimant qualifies

as "disabled" for purposes of obtaining disability insurance benefits.  *See Leggett v. Chater*, 67 F.3d

558, 563 (5th Cir. 1995).  The claimant bears the burden of proving disability, including at the second

step where the ALJ considers whether the claimant suffers from a severe impairment. *See Id.* at 564;

*see also* 20 C.F.R. § 404.1520.  Listing 14.08 provides:

> Human immunodeficiency virus (HIV) infection. With documentation as described in
> 14.00D3 and one of the following: . . .
>
> I.      HIV wasting syndrome, characterized by involuntary weight loss of 10
>        percent or more of baseline (or other significant involuntary weight loss, as
>        described in 14.00D2) and, in the absence of a concurrent illness that could
>        explain the findings, either:
>
>        1.  Chronic diarrhea with two or more loose stools daily lasting for 1 month
>        or longer; or
>
>        2. Chronic weakness and documented fever greater than 38°C (100.4° F) for
>        the majority of 1 month or longer.

20 C.F.R. part 404, subpart P, Appendix 1, § 14.08. 14.00(D)(3) states:

> Documentation of HIV infection.  The medical evidence must include documentation
> of HIV infection.  Documentation may be by laboratory evidence or by other
> generally acceptable methods consistent with the prevailing state of medical
> knowledge and clinical practice.

---

[7]The last medical record in the case is from July 23, 2004, which was before the time of the
hearing.  Tr. 207.  Plaintiff has not pointed out any new evidence that was not available during the
hearing.

14

      a.    Documentation of HIV infection by definitive diagnosis.  A definitive diagnosis of HIV infection is documented by one or more of the following laboratory tests:

          i.    A serum specimen that contains HIV antibodies.  HIV antibodies are usually detected by a screening test.  The most commonly used screening test is the ELISA.  Although this test is highly sensitive, it may yield false positive results.  Therefore, positive results from an ELISA must be confirmed by a more definitive test (e.g., Western blot, immunofluorescence assay).

20 C.F.R. part 404, subpart P, Appendix 1, § 14.00(D)(3).  A specimen of serum taken from Plaintiff on January 24, 2003 was subjected to the ELISA screening test, which showed Plaintiff had HIV antibodies.  Tr. 181.  A serum specimen from Plaintiff was also subjected to the Western Blot screening test, which showed Plaintiff had HIV antibodies.  Thus, there is documentation in Plaintiff's medical records satisfying 14.00(D)(3).

In regards to Plaintiff's weight, on March 4, 2003, Plaintiff weighed 157 pounds.  Tr. 173.  By December 1, 2003, Plaintiff weighed 193 pounds, and at the hearing on August 19, 2004, Plaintiff was back down to 155 pounds.  Tr. 229, 276.  The M.E. testified that Plaintiff was incarcerated from June until December of 2003.  Tr. 281.  The M.E. expert explained that gaining weight in prison is very common because inmates do not get a lot of physical activity while they are incarcerated.  Tr. 282.  Additionally, the medical records from the prison show that Plaintiff was getting two trays at every meal, which seems to mean that Plaintiff was being fed twice as much as the average inmate, however, no explanation was provided.  Tr. 234.  Plaintiff argues that the weight loss is a result of being on the chemical cocktail.  However, Plaintiff was on the chemical cocktail  for more than a

month while he was in prison, from June 25, 2003 until July 29, 2003,[8] and he has not provided any information substantiating his allegation that he lost weight during this time period. Tr. 232-35. More importantly, at the time of the hearing, when Plaintiff testified that his weight had dropped to 155 pounds, he had not restarted the chemical cocktail.[9] Tr. 279, 280, 282. Thus, Plaintiff's weight loss cannot be attributed to taking his HIV medications, as he alleges. Additionally, the evidence in the record indicates that Plaintiff baseline or usual weight is around 157 pounds. There is no evidence in the record that Plaintiff lost a significant amount of weight given his baseline, so Plaintiff does not meet the listing for 14.08(I).

As for the diarrhea that Plaintiff is reporting, he testified that he has diarrhea 4-6 times a month for 2 to 4 days at a time, during which time he has diarrhea 6 to 10 times a day. Tr. 275-76. However, the listing states that the diarrhea must occur every day one or two times a day for at least a month. *See* 20 C.F.R. part 404, subpart P, Appendix 1, § 14.08. However, in Plaintiff's reply, he argues that his bouts of diarrhea wax and wane, and Plaintiff testified he does not have diarrhea every day.

Additionally, Plaintiff argues that the HIV medications cause his diarrhea. Although the M.E. testified that diarrhea can be a side effect of the chemical cocktail, she noted that since he had not restarted the drugs, the diarrhea could not be a result of the chemical cocktail. Tr. 282. Although Plaintiff claims that he was diagnosed with Crohn's disease when he was 14, the M.E. concluded there is no evidence that his diarrhea is a result of HIV, Crohn's, or any kind of infection. Tr. 282-83.

---

[8]Thus, Plaintiff's report that he was on the chemical cocktail for a week while in prison is inaccurate.

[9]It was not until July 23, 2004 that Dr. Acker found that Plaintiff's T-cell count was below 300, so Plaintiff needed to be started on the chemical cocktail. Tr. 207.

However, the source of the diarrhea does not appear to be determinative in whether or not Plaintiff meets the listing.

Whether or not Plaintiff's diarrhea would satisfy the requirement in the listing is inapposite, however, because Plaintiff does not have the requisite weight loss. Thus, the ALJ''s finding that Plaintiff's severe impairments do not meet the listing is supported by substantial evidence.

**B.     Did the ALJ's Give Too Much Weight to the Doctors' Opinions?**

Plaintiff argues that the ALJ gave too much weight to the M.E.'s opinion, despite the fact that the evidence supports Plaintiff's testimony. Plaintiff also disputes the opinions of his treating physician, Dr. Acker. In response, Defendant asserts that the ALJ's assessment of the record was supported by substantial evidence and reached through the proper application of the relevant legal standards.

The Social Security Regulations provide that all medical opinions are to be considered in determining the disability status of a benefits claimant. 20 C.F.R. §§ 404.1527(b), 416.927(b). Nonetheless, opinions on ultimate issues, such as disability status under the regulations, are reserved exclusively to the ALJ. 20 C.F.R. §§ 404.1527(e)(1), 416.927(e)(1). Statements by medical sources to the effect that a claimant is "disabled" are not dispositive, but an ALJ must consider all medical findings and evidence that support such statements. *Id.* Additionally, the Commissioner "will not give any special significance to the source of an opinion on issues reserved to the Commissioner" including a claimant's residual functional capacity, which is a finding expressly reserved to the Commissioner. 20 C.F.R. §§ 404.1527(e)(2) and (3).

The regulations break medical source opinions down into three general categories: non-examining, non-treating, and treating. 20 C.F.R. §§ 404.1502, 416.902. Non-examining sources are

those whose assessments are premised solely on a review of medical records. *Id.* State agency medical consultants relied upon by the ALJ fall into this category. *Id.* Non-treating sources are those who have examined the claimant, but who do not have "an ongoing treatment relationship" with him. *Id.* This "term includes an acceptable medical source who is a consultative examiner . . . when the consultative examiner is not [a claimant's] treating source." *Id.* Finally, medical sources who have had an "ongoing treatment relationship" with the claimant are regarded as treating sources. *Id.*

It is well-settled that the opinion of a treating physician should be accorded great weight in determining disability. *Newton v. Apfel,* 209 F.3d 448, 455 (5th Cir. 2000). However, the Fifth Circuit has held that where good cause is shown, a treating physician's opinion can be given limited or no weight if the opinion is not supported by the evidence. *See Myers v. Apfel,* 238 F.3d 617, 621 (5th Cir. 2001) (quoting *Greenspan v. Shalala*, 38 F.3d 232, 237 (5th Cir. 1994)).

Plaintiff argues that the evidence supports the fact that he had diarrhea, fatigue, and weight loss. However, no one disputes that Plaintiff has these problems. The M.E. testified that Plaintiff should be limited to light work, meaning that he should not be lifting more than 20 pounds because people with HIV, especially once they start the chemical cocktail, complain of fatigue. Tr. 283. Thus, the M.E. relies on Plaintiff's testimony regarding the fact that he is experiencing diarrhea, fatigue, and weight loss in forming her opinion.

Plaintiff objects to Dr. Acker's statements that he refused to sign Plaintiff's disability papers, because he did not think Plaintiff was disabled; told Plaintiff he needed to find a job; and told the district attorney that Plaintiff was able to work. Tr. 210, 208. Plaintiff asserts that these statements are not supported by the record. However, other than Plaintiff's reported anxiety attacks and poor judgment because he has been incarcerated twice, Dr. Williams, a psychologist, found Plaintiff to have

normal thought processes, content, perception, and cognition. Tr. 187-88. Additionally, Dr. Boulos, a psychiatrist, found Plaintiff had mild restrictions in his daily living, maintaining social functioning, and maintaining concentration persistence and pace. Tr. 153. Dr. Boulos also found Plaintiff's memory to be intact, his concentration to be good, and that he could complete tasks in a timely, accurate manner over a sustained period of time. Tr. 155. Although he also found Plaintiff's judgment to be below normal because of his arrests, Dr. Boulos stated that he did not feel Plaintiff's limitations were fully supported by the evidence. *Id.* Dr. Spoor, a medical consultant, determined that Plaintiff had no postural, manipulative, visual, communicative, or environmental limitations and stated that Plaintiff's alleged limitations were not supported by the evidence in the record. Tr. 137-39, 140.

Plaintiff also argues that there is no evidence that Dr. Acker was familiar with the regulations and the criteria for meeting the HIV listings. However, Dr. Acker filled out two different Medical Reports on Adults with Allegation of HIV Infection, both of which contained the exact description of HIV wasting syndrome from the listing, and Dr. Acker did not find that Plaintiff had HIV wasting syndrome either time he filled out the form.[10] Tr. 192, 195. Thus, it is clear that Dr. Acker was familiar with the listing for HIV wasting syndrome. Additionally, it is the ALJ, not the treating physician, that makes the determination of whether or not Plaintiff is disabled, and the ALJ's decision

---

[10]Although Dr. Acker did check that Plaintiff had diarrhea which met the listing, there is no evidence in the record that Plaintiff's diarrhea required intravenous hydration, intravenous alimentation, or tube feeding, so this appears to have been a mistake. Tr. 195.

is supported by substantial evidence.[11]   There is no reason to find that the ALJ gave the M.E.'s

testimony too much weight or that there was good cause not to rely on Dr. Acker's opinions.

**C.      Did the ALJ improperly discount Plaintiff's credibility?**

Plaintiff argues that the ALJ incorrectly discounted his credibility.  The Commissioner argues

that the ALJ properly considered the evidence in the record and Plaintiff's testimony in assessing

Plaintiff's credibility.

Although Plaintiff testified that he has AIDS, none of the evidence in the record supports this

assertion.  Plaintiff was never diagnosed with AIDS.  The evidence does not show that Plaintiff's T-

cell count had ever dropped below 275.  However, his treating doctor noted that when the T-cell

count drops below 350 is when it is time to start the chemical cocktail.  Tr. 220.  Even the website

cited by Plaintiff regarding T-cell counts and the threshold for a person to be considered as having

AIDS, does not support the contention that Plaintiff has AIDS.[12]   Thus, the ALJ was correct to

discount Plaintiff's testimony stating that he had AIDS.

The ALJ noted that he did not find Plaintiff's claims of total disability to be entirely credible.

Tr. 18.  Plaintiff takes issue with the fact that the ALJ found that Plaintiff's unwillingness to take the

chemical cocktail demonstrated that his symptoms could not be disabling.  However, the Code of

Federal Regulations provides:

> (a) **What treatment you must follow**. In order to get benefits, you must follow
> treatment prescribed by your physician if this treatment can restore your ability to
> work.

---

[11]Plaintiff alleges that if Dr. Acker had said Plaintiff was disabled the ALJ would not have
relied on his opinion.  The basis for this statement is unclear.

[12]Plaintiff cites to a website which states that a T-cell count below 200 constitutes AIDS.  *See*
Plaintiff's Brief.

(b) **When you do not follow prescribed treatment.** If you do not follow the prescribed treatment without a good reason, we will not find you disabled or, if you are already receiving benefits, we will stop paying you benefits.

(c) **Acceptable reasons for failure to follow prescribed treatment**. We will consider your physical, mental, educational, and linguistic limitations (including any lack of facility with the English language) when determining if you have an acceptable reason for failure to follow prescribed treatment. The following are examples of a good reason for not following treatment:

> (1) The specific medical treatment is contrary to the established teaching and tenets of your religion.

> (2) The prescribed treatment would be cataract surgery for one eye, when there is an impairment of the other eye resulting in a severe loss of vision and is not subject to improvement through treatment.

> (3) Surgery was previously performed with unsuccessful results and the same surgery is again being recommended for the same impairment.

> (4) The treatment because of its magnitude (e.g. open heart surgery), unusual nature (e.g., organ transplant), or other reason is very risky for you; or

> (5) The treatment involves amputation of an extremity, or a major part of an extremity.

20 C.F.R. § 404.1530. Side effects[13] and cost are not reasons listed in the Code of Federal Regulations as a good reason for not following your doctor's orders and taking the medication you are prescribed and can be a basis for finding a person not to be disabled. Additionally, the Fifth Circuit has found that the ALJ's credibility determination is entitled to great deference and it is not improper for the ALJ to draw inferences about a person's credibility and the severity of that person's impairments based on that person's failure to obtain treatment or medication due to poverty. *Salas*

---

[13]It should be noted that although Plaintiff claims the diarrhea and weight loss are a result of the chemical cocktail, Plaintiff was not taking the chemical cocktail when he reported these symptoms.

*v. Barnhart*, No. 03-50409, 84 Fed.Appx. 447, 448-49 (5th Cir. Jan. 6, 2004). Thus, the ALJ's finding regarding Plaintiff's credibility should not be disturbed.

**D.     Did the ALJ err in not making a specific finding that Plaintiff could maintain employment?**

In his reply, Plaintiff argues that his diarrhea waxes and wanes, which is consistent with an inability to maintain employment.

The Fifth Circuit considered this issue in *Watson v. Barnhart*, where the ALJ found that the claimant had a severe degenerative disc disease, but was not disabled and had an exertional capacity for medium work. 288 F.3d 212, 215 (5th Cir. 2002). The claimant argued that the ALJ erred in failing to make a determination that he could maintain employment. *Id.* at 217. The Fifth Circuit agreed. *Id.* at 218. This issue, however, was revisited by the Fifth Circuit in *Frank v. Barnhart*, 326 F.3d 618, 619-20 (5th Cir.2003). In *Frank*, the Fifth Circuit clarified that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Id.* at 619. The Fifth Circuit further explained:

> *Watson* required the ALJ to make a finding as to the claimant's ability to maintain a job for a significant period of time, notwithstanding the exertional, as opposed to non-exertional (e.g., mental illness) nature of the claimant's alleged disability. Watson requires a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms. For example, if Frank had alleged that her degenerative disc disease prevented her from maintaining employment because every number of weeks she lost movement in her legs, this would be relevant to the disability determination. At bottom, *Watson* holds that in order to support a finding of disability, the claimant's intermittently recurring symptoms must be of sufficient frequency or severity to prevent the claimant from holding a job for a significant period of time. An ALJ may explore this factual predicate in connection with the claimant's physical diagnosis as well as in the ability-to-work determination. Usually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment. Nevertheless, an occasion may arise, as in *Watson*, where the medical impairment, and the symptoms thereof, is of such a nature that separate

consideration of whether the claimant is capable of maintaining employment is required. Frank did not establish the factual predicate required by *Watson* to necessitate a separate finding in this regard.

*Id.* at 619-20.

While it is true that in general determining a claimant's residual functional capacity requires consideration of whether a claimant is able to perform work duties on a continuous basis, there is no requirement that an ALJ make an explicit "regular and continuing basis" finding absent evidence of a waxing and waning nature of the claimant's symptoms, such that the impairment interferes with the claimant's ability to maintain employment on a continuing basis. *Campbell v. Barnhart*, 374 F.Supp.2d 498, 502-03 (E.D. Tex. 2005).

In this case, there is no medical evidence substantiating Plaintiff's testimony regarding the frequency of his diarrhea. Plaintiff's treating doctor, who could not find the cause of Plaintiff's diarrhea, but was fully apprised of Plaintiff's condition, told Plaintiff and the district attorney that Plaintiff was not disabled and told Plaintiff he should find a job. Tr. 210, 208. Thus, it is clear that Plaintiff's treating doctor did not think Plaintiff's condition would prevent him from maintaining employment. The question posed to the V.E. was if someone had to continuously take breaks up to two or three times an hour, would that be acceptable. Tr. 288. However, Plaintiff testified that he does not have diarrhea every day, and when he has diarrhea over the course of a 24 hour day, he has to go to the bathroom 6 to 10 times. Tr. 275-76. This testimony is not consistent with having to go to the bathroom multiple times an hour. Plaintiff does not testify that his frequency of diarrhea prevents him from working, and it does not rise to the level of a disability. Thus, there was no requirement for the ALJ to make a separate finding that Plaintiff could maintain employment because

23

the evidence does not support a conclusion that the allegedly waxing and waning nature of Plaintiff's diarrhea would interfere with his ability to maintain employment on a continuing basis.

## VII.  RECOMMENDATION

The Magistrate Court **RECOMMEND**S that the District Court **AFFIRM** the final decision of the Commissioner and **ENTER JUDGMENT** in favor of the Defendant.

## VIII.  WARNINGS

The parties may file objections to this Report and Recommendation.  A party filing objections must specifically identify those findings or recommendations to which objections are being made.  The District Court need not consider frivolous, conclusive, or general objections.  *Battles v. United States Parole Comm'n,* 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within ten (10) days after the party is served with a copy of the Report shall bar that party from de novo review by the district court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the district court.  *See* 28 U.S.C. § 636(b)(1)(C);  *Thomas v. Arn*, 474 U.S. 140, 150-153, 106 S. Ct. 466, 472-74 (1985);  *Douglass v. United Services Automobile Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996) (en banc).  The clerk is directed to send a copy of this Report and Recommendation to the parties by certified mail, return receipt requested.

SIGNED this 5th day of May, 2006.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE

24